IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GERMAN ROMAN-OLIVER,**

    Petitioner,

    v.

**UNITED STATES OF AMERICA,**

    Respondent.

Case No. 2:15-cv-00437
Crim. No. 2:11-cr-069
Chief Judge Sargus
Magistrate Judge King

## ORDER AND
## REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings this motion to vacate pursuant to 28 U.S.C. § 2255. This matter is before the Court on the *Motion to Vacate* (ECF No. 154), Respondent's *Response to Motion* (ECF No. 158), Petitioner's *Reply* (ECF No. 161), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate* (ECF No. 154) be **DENIED** and that this action be **DISMISSED**.

Petitioner's request for an evidentiary hearing is **DENIED**.

**Facts and Procedural History**

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case as follows:

> Petitioner was allegedly involved in a conspiracy, starting in the summer of 2007, to distribute large amounts of cocaine. The Drug Enforcement Agency ("DEA") conducted an investigation into this conspiracy. Through surveillance and witness statements, the DEA began to suspect that Petitioner was involved in two different conspiracies, one in the area around Columbus, Ohio, and the other in the areas around Dayton and Springfield, Ohio.
>
> First, the DEA identified Tarico Smith as a suspect involved in distributing cocaine. While agents conducted surveillance of

Smith, they first saw Petitioner at a residence known to be used by Smith for storing and distributing cocaine.

In March 2009, Petitioner paid cash for a plane ticket to the Dominican Republic. DEA task force officers approached Petitioner at the airport and asked for his consent to search his person and his luggage. During this search, agents discovered $34,929 in cash on his person and concealed in his bags.

Almost a year later, in January 2010, when DEA agents arrested Smith and executed a search warrant at his home, they discovered 688 grams of cocaine, more than $18,000, and a loaded .40 caliber Glock. In Smith's phone records, agents found a contact listing for "Mike," who had a New York area code. When asked about "Mike," Smith indicated that the individual was his cocaine supplier and identified Petitioner as that supplier.

During this time, DEA agents were concurrently investigating Jerdin Yanes as a suspected drug trafficker. Yanes was arrested in October 2009 in Columbus, Ohio. During his arrest, agents searched Yanes' phone and discovered a number for "German," who also had a New York area code.

On February 25, 2011, after conducting surveillance and investigation of various individuals' telephone records, officers arrested Petitioner at his home. At the time, Petitioner had three cell phones in his possession?one was registered to him and the other two, which had New York area codes, were registered to other individuals. Petitioner consented to a search of his residence. Agents found $1,500 in cash, a car title in the name of Stephen Oscar Gonzalez, and two additional cell phones. They also discovered two loaded firearms at Petitioner's residence, both of which were registered in his name. The police did not discover drugs during this search.

Petitioner was indicted on a number of charges and proceeded to trial. A number of individuals, most of whom were Petitioner's co-conspirators, testified against him at trial. As Petitioner's brief indicates, most or all of these individuals received deals for providing statements and testifying at Petitioner's trial. Many of these witnesses indicated that their statements at trial were inconsistent with prior statements given outside of court.

A.  Etienne "Troy" Manning's Testimony

Manning testified that Petitioner was an acquaintance of his from the Columbus area. He explained that he purchased marijuana from Petitioner on a few occasions at his (Manning's) residence. According to Manning, Petitioner called him to ask whether he knew of anyone interested in purchasing cocaine. In response, Manning introduced Petitioner to his friends, Tarico Smith and Charles Antwon Hampton.

Manning explained at trial that following that introduction, Smith and Hampton began purchasing cocaine from Petitioner on a regular basis. Each of these transactions occurred at Manning's residence. According to Manning's version of the events, Smith purchased cocaine from Petitioner on six to eight occasions in quantities ranging from nine ounces to four kilograms. At a later date, Manning provided Petitioner's phone number to Smith, who began dealing directly with Petitioner.

B.  Smith's Testimony

Smith testified that he began selling drugs after being released from prison in March 2007 and a halfway house on parole later that year. Smith stated that he obtained cocaine from Petitioner at Manning's apartment on three or four occasions.

Once Smith purchased Petitioner's phone number from Manning, he began transacting directly with Petitioner at Smith's house on 13th Street. These transactions continued until Smith's 2010 arrest. Smith purchased cocaine from Petitioner two times per week during that time period, which he estimated amounted to about twenty separate transactions. According to Smith, he generally purchased between one and three kilograms of cocaine during these transactions. Smith testified that he distributed the drugs purchased from Petitioner to various customers, including Gregory Hamrick and Terrance Vance. He also claimed to have introduced Petitioner to Charles Hampton, who later purchased cocaine from Petitioner on four or five occasions.

Smith also stated that he received a delivery from Petitioner of over 500 grams of cocaine shortly before his arrest in January 2010. This cocaine was discovered by DEA officers when they executed a search warrant at Smith's residence.

Finally, Smith testified that he never smoked marijuana with Petitioner.

C. Charles Hampton's Testimony

Hampton was arrested by DEA agents in April 2011 on drug charges. At that time, Hampton stated that he only knew Petitioner because he purchased marijuana from him. At trial, however, Hampton testified that he previously lied to officers and that he knew Petitioner from his presence at Manning's home during drug deals. In addition to his claims that he purchased cocaine from Manning, Hampton also claimed that Manning introduced him to Petitioner sometime around 2007 or 2008. After that introduction, Hampton met with Petitioner at Manning's home a number of times to obtain cocaine. On each of these occasions, Petitioner sold between two ounces and two kilograms of cocaine to Hampton. Sometime around 2008 or 2009, Hampton starting transacting with Petitioner through Smith, from whom he later obtained Petitioner's cell phone number. After obtaining this phone number, Hampton transacted directly with Petitioner once or twice a month until February 2011. On each of those occasions, Hampton purchased about one or two kilograms of cocaine.

D. Testimony from Gregory Hamrick and Terrance Vance

Hamrick testified that he and Smith had been close friends since childhood and that he bought two to four ounces of cocaine from Smith at various times throughout 2008. According to his testimony, Hamrick once saw Petitioner "just for a quick second" when he delivered cocaine to Smith. Hamrick described the physical characteristics of the package delivered by Petitioner, but he was unable to describe in detail the quantity of drugs in the package. Hamrick also described a second encounter with Petitioner in December 2009, when he witnessed Petitioner deliver a kilogram of cocaine to Smith.

Vance testified at trial that after he and Smith were released from prison, he bought cocaine from Smith. During this time, he witnessed Petitioner delivering cocaine to two different locations: the 13th Street and Brooks Avenue locations. According to Vance, each of these deliveries was in kilogram quantities.

E. Evidence of Springfield Area Conspiracy

According to trial testimony, from 2007 to 2009, Wilson Antonio Beltre transacted in large quantities of cocaine. One of Beltre's many suppliers was Petitioner, from whom he purchased 40 to 50 kilograms of cocaine between the beginning of 2007 and April

4

2009. Approximately fifteen times over the course of their relationship, Petitioner accompanied Beltre when he met with customers in the Springfield area.

Two of Beltre's customers were Jeff Norton and Brian Pinson, who were drug-dealing partners in the Springfield area. They regularly obtained kilogram quantities of cocaine from Beltre. The two men once traveled to Columbus to obtain cocaine from Beltre, but it was not ready when they arrived. While they waited outside, they witnessed Petitioner drive up to the home with two others. Once these three individuals entered the home, the cocaine was ready and available. During his testimony, Norton also stated that Petitioner previously helped him count money for a cocaine transaction between himself and Beltre.

F. Jerdin Yanes' Testimony

Yanes testified that starting in mid–2007 or early 2008 and continuing through mid–2009, he sold cocaine to Petitioner. He claims that Petitioner was one of his main customers during that time, purchasing between one and ten kilograms of cocaine from Yanes on a bi-weekly or even tri-weekly basis. Yanes delivered cocaine to Petitioner in the garage of his residence. Yanes stopped supplying Petitioner with cocaine a few months before his own arrest in October 2009.

G. Petitioner's Testimony

Petitioner acknowledged in his testimony that he knew Smith, Manning, and Hampton but insisted that he never sold cocaine to any of them. He claimed that he only purchased marijuana and occasionally smoked marijuana with these individuals. These statements by Petitioner were inconsistent with many of the witnesses' statements. First, Smith, Manning, and Hampton each testified that they never smoked marijuana with Petitioner. Second, they each testified that Petitioner had an ongoing cocaine sales relationship with Smith and Hampton. Petitioner also testified that he knew Beltre as a landlord and social acquaintance, not as a cocaine supplier.

H. Additional Evidence Regarding the Drug Trafficking Conspiracy

Evidence at trial indicated that Petitioner used multiple phones, many of which were in other people's names. DEA agents who examined the telephone records of individuals involved in the

conspiracies testified that there were extensive contacts between Petitioner's phones and the phones used by the other individuals involved in the two conspiracies.

II. Procedural History

Petitioner was charged with three criminal offenses and one count of criminal forfeiture. After a seven-day trial, during which numerous co-conspirators testified against Petitioner and he testified on his own behalf, the jury convicted Petitioner of conspiracy to distribute more than 500 grams and less than 5 kilograms of cocaine, a lesser included offense of the conspiracy charged in the Indictment. The jury found Petitioner not guilty of the other counts.

The probation office prepared a presentence investigation report ("PSR"), which recommended a base offense level of 38 based on testimony from one of his co-conspirators that he had delivered approximately 1,040 kilograms of cocaine to Petitioner over an extended period of time. See U.S.S.G. § 2D1.1(c)(1). The PSR also recommended two two-level enhancements[, *i.e*.,] one for maintaining a premises for distribution of a controlled substance and the other for obstruction of justice based on Petitioner's trial testimony that repeatedly denied involvement in the drug-trafficking conspiracies. A later addendum to the PSR also recommended that Petitioner receive a two-level firearm enhancement. Petitioner objected to the amount of cocaine that was attributed to him in the PSR as well as each of the enhancements.

Over these objections, the district court found by a preponderance of the evidence that Petitioner distributed at least 150 kilograms of cocaine and therefore adopted a base offense level of 38. Had the district court calculated the offense level based on a drug quantity of less than 5 kilograms, the offense for which he was convicted, his total offense level would have been 30. That offense level, combined with Petitioner's criminal history category of I, would have resulted in a range of 121 to 151 months.

In addition to applying a higher total offense level, the district court imposed the obstruction of justice enhancement, and the court elected not to impose the other enhancements requested by the government. The district court found that Petitioner's denial of involvement in the conspiracy was inconsistent with the other witnesses' testimony and other evidence presented at trial, as well as the findings of the jury, and therefore constituted perjury and obstruction of justice.1 The district court chose not to apply the

>firearm enhancement because drugs were not found in Petitioner's home when the two loaded firearms were discovered. Therefore, the district court imposed a total offense level of 40 and a criminal history category of I, which corresponds with a Guidelines range of 292 to 365 months. Due to Petitioner's lack of a criminal record, good work record, and the fact that he had minor children, the district court varied downward to 192 months of incarceration.
>
>Petitioner timely appealed his sentence.
>
>FN1: The district court stated that if "someone has taken the stand and lied . . . then the guideline [enhancement] should apply . . . and on key points what the defendant denied is exactly what the jury found, and I find no reason to want to second guess the jury with regard to Count 1. So I do think the enhancement is properly applied."

*United States v. Roman-Oliver*, 564 Fed.Appx. 156, 157-161 (6th Cir. 2014). On April 23, 2014, the United States Court of Appeals for the Sixth Circuit affirmed the judgment of this Court. *Id.* On December 8, 2014, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari. Roman-Oliver v. United States*, 135 S.Ct. 753 (2014).

On February 2, 2015, Petitioner filed the *Motion to Vacate*. As his single claim for relief, Petitioner alleges that he was denied the effective assistance of counsel because his attorney failed to communicate two plea offers and that, as a result, he was forced to proceed to trial. Under the proposed plea offers, Petitioner states, he likely would have obtained a lower sentence. Respondent contends that this claim lacks merit.

**Standard of Review**

In order to obtain relief under 28 U.S.C. § 2255, a defendant must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir.1990) (*per curiam*). Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States, when the trial

7

court lacked jurisdiction, or when the sentence exceeds the maximum sentence allowed by law or is "otherwise subject to collateral attack." *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991). Apart from constitutional error, the question is "whether the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice,'" *Davis v. United States,* 417 U.S. 333, 346 (1974)(quoting *Hill v. United States*, 368 U.S. 424, 428–429 (1962); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006). Nonconstitutional claims not raised at trial or on direct appeal are waived for collateral review except where the errors amount to something akin to a denial of due process. Mistakes in the application of the Sentencing Guidelines will rarely, if ever, warrant relief from the consequences of waiver. *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996).

It is well-established that a motion to vacate under § 2255 "is not a substitute for a direct appeal." *Ray v. United States,* 721 F.3d 758, 761 (6th Cir. 2013)(quoting *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167–68 (1982)). Accordingly, claims that could have been raised on direct appeal, but were not, will not be entertained through a motion under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims previously; or (2) that he is "actually innocent" of the crime. *Ray,* 721 F.3d at 761 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)) (internal citations omitted).

**Ineffective Assistance of Counsel**

Petitioner represents that he expressly asked his attorney to engage in plea negotiations with the government in order to avoid a trial. According to Petitioner, counsel informed him that the government was not willing to do so, and that Petitioner could not enter a guilty plea without a plea agreement. Therefore, Petitioner maintains, he proceeded to trial against his will.

8

Petitioner claims that his attorney never communicated to him any proposed plea offers from the government, and alleges that he learned only after his conviction and sentence, when he was reviewing the trial transcripts, that the government had in fact conveyed two plea offers. Petitioner also alleges that an on-the-record discussion of plea negotiations took place during the course of the trial but outside his presence. Petitioner insists that he would have pleaded guilty, had he known that he could do so. He told his attorney that he did not want a trial because he knew that his co-defendants would testify against him and he feared that he would be found guilty and receive a lengthy sentence. According to Petitioner, his attorney felt that he had a strong likelihood of success at trial. *See Affirmation of German Roman-Oliver* (ECF No. 154, PageID# 2773.)

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient, or that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment, and that this deficient performance prejudiced the petitioner. *Id*. at 687. This showing requires that defense counsel's errors were so serious as to deprive the defendant of a fair and reliable trial. *Id.*

A criminal defendant is entitled to the effective assistance of counsel during the plea negotiation process. *Lafler v. Cooper*, ⸺ U.S. ⸺, 132 S.Ct. 1376, 1384 (2012).

> Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances),

9

> that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id*. at 1385. The United States Court of Appeals for the Sixth Circuit has described the obligations of defense counsel as it relates to advice during the plea negotiations stage:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time.

*Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (citing *United States v. Day,* 969 F.2d 39, 43 (3rd Cir. 1992)). "A defense attorney's failure to notify his client of a prosecutor's plea offer constitutes ineffective assistance of counsel under the Sixth Amendment and satisfies the first element of the *Strickland* test." *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003)(citing *Turner v. State*, 858 F.2d 1201, 1205 (6th Cir. 1988)).

"The second element of the *Strickland* test in the plea offer context is that there is a reasonable probability the petitioner would have pleaded guilty given competent advice." *Id*. (citing *Turner,* at 1206). A substantial disparity between the terms of a plea offer and the potential sentence constitutes strong evidence that it is reasonably probable that a properly advised defendant would have accepted the plea offer. *Smith*, 348 F.3d at 552 (evidentiary hearing warranted as to whether defendant would have pleaded guilty where attorney failed to convey plea offer of five years and defendant sentenced to 156 months) (citing *Magana v. Hofbauer*, 263 F.3d 542, 552–53 (6th Cir. 2001) (difference between ten and twenty year

sentence significant)). An attorney's failure to insist that his client accept the government's plea offer does not, however, constitute constitutionally ineffective assistance.

> The decision to plead guilty—first, last, and always—rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Id*.

Contrary to Petitioner's allegation, the record reflects that, upon completion of testimony on the third day of trial, in open court, *see Transcript, Vol. III* (ECF No. 134, PageID# 1975), the prosecutor made clear for the record that the government had engaged in plea negotiations with the defense:

> MR. PASHAYAN: My colleague, Mr. Squires, and I have been discussing this. I know at one of the final pretrial conferences we had mentioned, and it was embodied in the United States pretrial memorandum, the fact that the United States had made a couple of different offers to Mr. Roman-Oliver to plead guilty. And I just wanted to make sure that we had it on the record that he was aware of the terms and conditions of that plea. They were both ten-to-life pleas. I think at one point in time it might have been to a base offense level of 34. And the most recent one at the satellite office I think was to a base offense level 38.
>
> But to that extent, Your Honor, since the Court and Mr. Reed and I had discussed that outside the presence of Mr. Oliver, I just wanted to make sure that was on the record, that such offers had been tendered.
>
> MR. REED: Well, unlike some of the attorneys we have heard from – or heard from the witnesses who don't go over plea agreements with them, at least allegedly, and things like that, I think Mr. Oliver is comfortable that he and I have discussed all the possibilities in terms of pleading and not pleading.
>
> COURT: I have no doubt about that. But it's always good to put it on the record.

>MR. REED: Oh, absolutely. Absolutely.
>
>MR. PASHAYAN: I didn't mean to suggest otherwise.
>
>COURT: Certainly. All right.
>
>Any other matters then before we recess?
>
>MR. REED: No, Your Honor, not on behalf of the defense.

*Id.* (PageID# 1980-81.) In view of the foregoing, Petitioner's current allegations that his attorney did not convey the government's plea offer(s) to him, that Petitioner did not know that he could enter a guilty plea, and that he was forced into proceeding to trial are unworthy of credit. The record is clear that the government had extended two plea offers to the Petitioner, but that Petitioner was not interested in entering a guilty plea. Petitioner has failed to establish either that counsel performed in a constitutionally ineffective manner, or that he was thereby prejudiced.

No evidentiary hearing is required where a petitioner's allegations cannot be accepted as true because they are contradicted by the record or are inherently incredible. *Arrendondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)(citing *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)). Such are the circumstances here.

### Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate* (ECF No. 154) be **DENIED** and that this action be **DISMISSED**.

Petitioner's request for an evidentiary hearing is **DENIED**.

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those

specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

   *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
June 7, 2016

13